UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL MINNIFIELD, | ) | |
| | ) | |
| Petitioner, | ) | No. 1:22-CV-01928 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| ANTHONY WILLS, Warden, Menard | ) | |
| Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

MEMORANDUM OPINION AND ORDER

Michael Minnifield seeks habeas relief from his state court conviction. 28 U.S.C. § 2254; R. 1, Habeas Pet.[1] He presents a claim for ineffective assistance of trial counsel. Habeas Pet. For the reasons that follow, the petition is denied. His request for an evidentiary hearing is also denied, because the factual disputes have been reasonably resolved by the state court.

## I. Background

When considering habeas petitions, federal courts must presume that the factual findings made by the last state court to decide the case on the merits are correct, unless the petitioner rebuts those findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012). Minnifield has not provided clear and convincing evidence to rebut the presumption of correctness, so this factual background is taken from the Illinois Appellate Court's opinion.

---

[1]This Court has subject matter jurisdiction over this case under 28 U.S.C. § 2241. Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

## A. Facts

Minnifield and two co-defendants were charged with multiple counts of first-degree murder, attempted murder, and aggravated battery with a firearm in connection with a 2009 drive-by shooting. R. 19-14, State's Resp. Exh. 14, *People v. Minnifield*, 2021 WL 1885980, at *1 (Ill. App. Ct. May 7, 2021). The drive-by shooting resulted in the killing of Renault Darling and injuries to two others. *Id.* The government alleged that Minnifield—as the rear passenger of the car—was one of the shooters. *Id.* One of Minnifield's co-defendants, Angelo Straight, pled guilty to conspiracy to commit murder and agreed to testify against Minnifield at trial. *Id.* at *1–2. For his part, Minnifield pled not guilty and the case went to a jury trial in 2011. R. 19-2, State's Resp. Exh. 2, Suppl. Report of Proceedings at A-1.

### 1. Jury Trial

At trial, one of the surviving victims (Theodis Cook-Mims) and co-defendant Angelo Straight each testified against Minnifield. *Minnifield*, 2021 WL 1885980, at *1. Cook-Mims testified that he was a former member of the Gangster Disciplines gang and was visiting Darling on the day of the shooting. *Id.* They were outside of Darling's house when Cook-Mims saw a blue Dodge Charger drive up; shots were fired from the car at Cook-Mims and others in his group. *Id.* Cook-Mims was shot twice and went to the hospital for treatment. *Id.* Later, in a line-up at the police station, he identified Minnifield as the rear passenger of the blue Charger. *Id.* He apparently recognized Minnifield from high school. *Id.* On cross-examination, Minnifield's trial counsel, Earl Grinbarg, emphasized that Cook-Mims was high on

2

marijuana during the shooting and that he had told the grand jury in the case that he was not paying attention to whoever was in the front passenger seat. *Id.* at *1, *4.

Angelo Straight testified at trial that he and Minnifield were members of the Black P Stones gang, and that the two were close friends. *Minnifield*, 2021 WL 1885980, at *1. According to Straight, the Black P Stones blamed the Gangster Disciples for the deaths of two of their fellow gang members. *Id.* He testified that Minnifield sang in a rap song entitled "F*** Dro City," which included references to "Gangster Disciple Killer[s]" and mentioned the names of the two deceased Black P Stones members. *Id.* According to Straight, on the night of the shooting, he drove his blue Charger to pick up Minnifield and their co-defendant, Kerry Williams, who was carrying a gun. *Id.* at *2. He said that they went to a liquor store, then a gas station, a studio, Williams's relative's house, and then back to the liquor store. *Id.* It was then that (according to Straight) Minnifield took the gun from the back door panel where Williams had stashed it. *Id.* The three men went to Dro City—a neighborhood of Chicago that was "commanded" by the Gangster Disciples—to shoot at Gangster Disciples who were "not paying attention." *Id.* At some point in the night, Minnifield collected a second gun from a nearby house. *Id.* The trio later came upon a group of several people around Ellis and 63rd Street, and Minnifield and Williams began shooting out of the windows of the Charger. *Id.* Straight then stopped driving while the other two men continued to shoot, and then they drove away and stashed the guns with someone named Fuzzy. *Id.* They were driving to get food when they were pulled over by the police. *Id.* On cross examination, attorney Grinbarg emphasized that

3

Straight had been facing a possible 90-year sentence and was instead given just 15 years in his plea deal in exchange for his testimony. *Id.* Grinbarg also elicited Straight's two prior felony convictions and his history of lying to law enforcement about the origins of the gun used in the shooting. *Id.*

The State also called an evidence analyst to testify that all three men in the blue Charger had gunshot residue on their skin, which meant that they all either fired a gun, touched something with gunshot residue on it, or "had a hand in the environment of a discharged firearm." *Minnifield*, 2021 WL 1885980, at *2. But the analyst testified that Minnifield had the *least* amount of gunshot residue on his hands compared to the others in the car, and that it was mostly only on his non-dominant hand. *Id.* At the end of trial, the jury found Minnifield guilty of first-degree murder and aggravated battery with a firearm, and he was sentenced to consecutive 48-year and 6-year terms in prison. *Id.* Minnifield filed a direct appeal challenging the sufficiency of the evidence and the introduction of the rap song into evidence. *Id.* The Illinois Appellate Court affirmed Minnifield's conviction and sentence. *Id.*

## 2. Postconviction Petition

In 2015, Minnifield filed a postconviction petition through new counsel, raising claims of ineffective assistance of trial counsel and actual innocence. *Minnifield,* 2021 WL 1885980, at *3. According to Minnifield, attorney Grinbarg failed to conduct a thorough and complete investigation into potential alibi witnesses. *Id.* He alleged that Grinbarg never once visited him in jail in the lead-up to trial and that all conversations with Minnifield occurred in the holding cell of the courtroom. *Id.*

4

Minnifield also asserted that he told Grinbarg that he was at a party on the night of the shooting from 6 p.m. to 11 p.m., and that he provided Grinbarg with the names and contacts of potential alibi witnesses that could testify as to his whereabouts at 10:30 p.m., which was the time of the shooting. *Id.* In support of his petition, Minnifield provided several witness affidavits.[2] *Id.* Each of these witnesses also testified at the evidentiary hearing held by the state post-conviction court. *Id.*

Minnifield's affidavit stated that on the night of the shooting, he was at a party from 6 p.m. until around 11 p.m., and that he talked to Tyesha McClinton and saw Ashley Brock there. *Minnifield*, 2021 WL 1885980, at *3. He was with Brock the entire time and left the party with both Brock and McClinton. *Id.* Once outside, he saw Straight in his blue Charger; Straight agreed to take Minnifield to eat and then to Minnifield's girlfriend's house. *Id.* He sat in the rear passenger seat, while Williams sat in the front passenger seat, and they were pulled over by police after leaving the party. *Id.* He also averred that he told Grinbarg that there were several witnesses to confirm his presence at the party at the time of the shooting, and orally provided McClinton's and Brock's names and numbers to him. *Id.* He said that his mother and

---

[2]Minnifield's postconviction petition also raised an actual-innocence claim, which is not before this Court now. *Minnifield,* 2021 WL 1885980, at *3; *see generally* Habeas Pet. (challenging the state appellate court's decision only on the ineffective assistance of trial counsel ground). In support of that claim, Minnifield provided an affidavit from Kevin Watson, who was on the street during the shooting, had observed the blue Charger, and denied seeing Minnifield inside the car. *Minnifield,* 2021 WL 1885980, at *4. Minnifield's habeas petition mentions the Kevin Watson testimony because it "goes to the overall strength of the evidence in the Record," Habeas Pet. at 17 n.1, but this Court refrains from summarizing the testimony here in full because it is not central to the ineffective-assistance issue raised in this case.

sister also told Grinbarg that he had alibi witnesses, but Grinbarg said that the witnesses "might say something to harm [him]," and that he did not usually contact alibi witnesses. *Id.* Minnifield continued to ask Grinbarg whether he had contacted the witnesses, and Grinbarg kept telling him no. *Id.* At that point, Minnifield says that he provided Grinbarg's contact information to the witnesses. *Id.* He further averred that Grinbarg never visited him in the Cook County Jail before the trial and never discussed trial strategy with him. *Id.*

At the evidentiary hearing, Minnifield reiterated that he was at a party on the night of the shooting from 6 p.m. to 11 p.m. *Minnifield*, 2021 WL 1885980, at *7. He said that he was talking to McClinton and left at the same time as Brock. *Id.* Once outside, he said he saw Straight's car. *Id.* Williams was seated in the front, and Minnifield asked Straight to drop him off at his girlfriend's house. *Id.* He also testified that he told Grinbarg about his alibi and that there were people that could confirm it at trial. *Id.* He said he provided the names of witnesses, but Grinbarg never wrote down the names or reached out to them. *Id.* He reiterated that Grinbarg told him he did not like calling alibi witnesses because they could harm his case. *Id.*

Minnifield's mother, Alicia Owens, stated in her affidavit that she insisted, several times, that Grinbarg call the alibi witnesses. *Minnifield*, 2021 WL 1885980, at *3. She also stated that Grinbarg told her he did not Minnifield's jail or like to call alibi witnesses for fear that they could say something harmful to Minnifield's case. *Id.* At the hearing, Owens testified that Grinbarg told her that he did not "do jails." *Id.* at *5. She also testified that she told Grinbarg the names of the potential

6

witnesses, but did not provide their numbers. *Id.* She first said that she learned of the names of the witnesses (Brock, McClinton, and Rasheed Johnson) from Minnifield, but then later said that her daughter also gave her McClinton's and Brock's names and that she learned of Johnson from the neighborhood, and not from either of her children. *Id.* She also acknowledged that her affidavit only mentioned Brock and that it did not say that Minnifield gave her McClinton's and Brock's names. *Id.*

Minnifield's sister, Michelle Minnifield, stated in her affidavit that Brock told her that she was at a party with Minnifield during the shooting and that he was there until 11 p.m. *Minnifield*, 2021 WL 1885980, at *3. Michelle apparently told Grinbarg this, and he said he would check into it, but did not. *Id.* She also averred that Grinbarg had told her he did not do jail visits or call alibi witnesses because they could harm the case. *Id.* At the hearing, she testified that it was Minnifield that told her about his alibi and gave her the names of the people who were at the party, which included McClinton and Johnson. *Id.* at *5. She said that she was present when Owens gave the information to Grinbarg, who said he would look into it. *Id.* She also testified that Brock and McClinton both called Grinbarg. *Id.* McClinton briefly spoke to him, and Brock told Michelle she had left a message. *Id.* She acknowledged that her affidavit did not mention McClinton or Johnson. *Id.*

McClinton's affidavit stated that she was at a party from around 8 p.m. to 11 p.m. on the night of the shooting and talked to Minnifield from roughly 10 p.m. to 11 p.m. *Minnifield*, 2021 WL 1885980, at *3. They left the party together at 11 p.m. but went their separate ways outside. *Id.* McClinton said that she knew the time because

7

she had checked it on her phone. *Id.* In 2011, Minnifield gave McClinton the name and number for Grinbarg, and she called him and said she could testify that Minnifield was with her at the time of the shooting. *Id.* Grinbarg said, however, that he was busy but would be in touch. *Id..* At the postconviction hearing, McClinton testified that she knew Minnifield since childhood, and was with him the night of the shooting. *Id.* at *6. She reiterated that she talked to Minnifield for about an hour and then left around 11 p.m., at the same time as Minnifield. *Id.* Months later, she learned of the charges against Minnifield, and he gave her his lawyer's number. *Id.* McClinton's hearing testimony reiterated that she had called Grinbarg, but he said he was busy and told her he would "get back to her," and never did. *Id.*

Brock's affidavit stated that she was at a party on the night of the shooting from around 7 p.m. to 11 p.m. *Minnifield*, 2021 WL 1885980, at *4. While there, Brock said that she "watched [Minnifield] all night," because she knew him through his sister, Michelle. *Id.* She was aware of the time all night because she was only 17 years old at the time and was worried about her curfew. *Id.* After Brock learned of Minnifield's arrest, she apparently told Michelle and Owens that she could help as a witness and to give her contact information to "whoever needed it." *Id.* According to Brock, Grinbarg never contacted her. *Id.* At the hearing, Brock testified that she told Minnifield at the party that she may need him to take her home, and then left at 11 p.m. and knew the time because she looked at her phone and a television that was playing the news as she left. *Id.* at *6. She walked out of the party with Minnifield. *Id.* She

8

reiterated that she told Michelle to give her contact information to Grinbarg, but says she was never contacted. *Id.*

Rasheed Johnson said in his affidavit that he was at the same party as Minnifield on the night of the shooting, and that Minnifield was sitting on the couch talking to a girl at 10:30 p.m. *Minnifield*, 2021 WL 1885980, at *4. Minnifield and the girl left at 11 p.m. *Id.* Johnson averred that he wanted to testify for Minnifield at the trial, but was not contacted. *Id.* At the hearing, Johnson testified that he had grown up with Minnifield and was a member of the Black P Stones gang at the time of the shooting. *Id.* at *6. He said that he was at the party on the night of the shooting and left around 1 a.m. *Id.* During the party, he spoke to Minnifield various times before Minnifield told him that he was leaving around 11 p.m. *Id.* He also testified that he "did not remember" if Minnifield came up to him before leaving, but that he saw Minnifield leave the party. *Id.* Johnson said that he later told Owens that Minnifield was at the party. *Id.* She told him that she would have a lawyer reach out, but no one ever did. *Id.*

Grinbarg also testified at the evidentiary hearing. *Minnifield*, 2021 WL 1885980, at *4. He said that Minnifield's case file was lost after a flood in his basement, and that he had taken over Minnifield's case from a public defender. *Id.* He acknowledged that all visits with Minnifield happened in the courtroom's holding area and that he did not take any notes during these because he felt that there was nothing to note. *Id.* He said that Minnifield had told him that he was at a party before the arrest, but did not say that he was at a party *during* the shooting. *Id.* Though

9

Grinbarg says he asked Minnifield about how he ended up in the blue Charger, Minnifield apparently did not provide him specifics. *Id.* When Minnifield's postconviction counsel confronted Grinbarg with the police report in which Minnifield stated that he was at a party on the night of the shooting, Grinbarg said that he would have "obviously" read that statement and went through the reports with Minnifield. *Id.* But he said that he did not ask Minnifield if there were witnesses he could speak with, and maintained that Minnifield did not give him any names. *Id.* On his interactions with Owens (Minnifield's mother), Grinbarg said that they spoke every month in the courthouse parking lot because Owens did not want to come to his office, and he did not remember her saying anything about interviewing witnesses. *Id.* at *5. But Grinbarg said that *if* Owens had mentioned witnesses, his "standard answer" would have been that the witnesses needed to come to his office. *Id.* He denied saying that he did not "do jails," or that he did not like to call alibi witnesses. *Id.* He said he did not remember Owens giving him any phone numbers and that McClinton's, Brock's, and Johnson's names did not ring a bell. *Id.* He also did not remember Michelle telling him that there were witnesses, or Owens complaining about his approach to the case. *Id.* According to Grinbarg, he and Owens had polite interactions throughout, and she even asked him to handle the appeal. *Id.*

On his trial strategy, Grinbarg said that he focused on creating reasonable doubt and asserting that Straight and Williams were the shooters. *Minnifield*, 2021 WL 1885980, at *5. In his opinion, the identification evidence from Cook-Mims was shaky at best, and Straight's credibility was lacking given his plea deal and track

10

record of lying to officers. *Id.* He planned to argue that the relatively small amount of gunshot residue on Minnifield's hands was transferred there when he entered the car without knowing that Straight and Williams had just committed the shooting. *Id.* According to Grinbarg, he did not need to have a story for why Minnifield was in the car; he only needed the jury to know that Minnifield *was* in the car to explain the gunshot residue. *Id.* He testified that he thought no one could believe Minnifield was a shooter and that the strategy of reasonable doubt was "right on." *Id.*

At the end of the postconviction hearing, the state court found that Minnifield failed to make a substantial showing of a constitutional violation, so the court denied the petition on both the ineffective-assistance claim and the actual-innocence claim. *Minnifield*, 2021 WL 1885980, at *7. The state court's oral ruling stated that the ineffective-assistance issue came down credibility, and the court found the State's witnesses to be more credible given the inconsistencies in the witness testimony for Minnifield's side. *Id.* Minnifield appealed the postconviction court's holding, but the Illinois Appellate Court affirmed in 2021. *Id.* at *10–11. Minnifield then filed a petition for leave to appeal with the Illinois Supreme Court, but that court denied leave in September 2021. Habeas Pet. at 31–32. Minnifield did not petition for writ of certiorari. *Id.* This time, in federal court, Minnifield raises only the ineffective-assistance claim. *See generally* Habeas Pet.

### B. Exhaustion

Those procedural steps were enough to exhaust the ineffective-assistance claim. Federal courts may only consider habeas petitions from state prisoners that

11

allege violations of the "Constitution or laws or treaties of the United States," 28 U.S.C. § 2254(a), and state prisoners must first exhaust state remedies before federal courts may consider their claims. 28 U.S.C. § 2254(b)(1)(A); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). In Illinois, exhaustion of state remedies requires a petitioner to "fairly present [a claim] through one complete round of the state's established appellate review process." *Small v. Woods*, 146 F.4th 590, 597 (7th Cir. 2025).

Because Minnifield raised the claim of ineffective assistance of trial counsel in his postconviction appeal to the Illinois Appellate Court (which affirmed the trial court in May 2021), and in his petition for leave to appeal to the Illinois Supreme Court (which was denied in September 2021), he has exhausted the state remedies relating to his ineffective-assistance claim. *See Minnifield,* 2021 WL 1885980, at *1; Habeas Pet. at 31–32. And Minnifield timely filed his 28 U.S.C. § 2254 petition for writ of habeas corpus in this Court. *See generally* Habeas Pet. (filed March 2022). Minnifield likewise claims in the habeas petition that his trial counsel was ineffective for "fail[ing] to perform even the basic duties of competent defense counsel" when he failed to meaningfully interview him or to investigate and pursue an alibi defense. Habeas Pet. at 32–41.

### III. Analysis

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, the relevant decision for review is that of the last state court to decide the merits of the petitioner's claims. *Morgan v. Hardy*, 662 F.3d 790, 797 (7th Cir. 2011). In this case, the relevant decision is the Illinois Appellate

Court's May 7, 2021, opinion upholding the postconviction court's dismissal of Minnifield's petition. *See Minnifield*, 2021 WL 1885980.

## A. Standard of Review

A federal court may not grant habeas relief unless the state court's decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). A state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Alternatively, under the "unreasonable application" avenue, a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *See id.* at 413. But even if a federal court independently concludes that the relevant state court decision applied clearly established federal law erroneously, still the writ does not necessarily issue; rather, the state court's application must be objectively unreasonable. *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003). "This is a difficult standard to meet; 'unreasonable' means 'something like lying well outside the boundaries of permissible differences of opinion.'" *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003) (quoting *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002)).

A state court's factual determinations must also be evaluated against the unreasonableness standard. 28 U.S.C. § 2254(d)(2). The state court's factual findings

13

are presumed correct, 28 U.S.C.§ 2254(e)(1), so merely asserting that the state court committed error is not enough to overturn factual findings, *Ward v. Sternes*, 334 F.3d 696, 703–04 (7th Cir. 2003). Instead, the petitioner could show that the state court determined the facts despite clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *see also Weaver v. Nicholson*, 892 F.3d 878, 881 (7th Cir. 2018). This kind of decision, by its terms, would be "so inadequately supported by the record as to be arbitrary and therefore objectively unreasonable." *Ward*, 334 F.3d at 704 (cleaned up).[3]

## B. Ineffective Assistance

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel. To receive habeas relief on the merits of his ineffective-assistance-of-counsel claim, Minnifield must meet the familiar two-element, performance-and-prejudice standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland,* he must show that his trial counsel's performance was deficient and that prejudice resulted. *Id.* at 687. For the performance element, the question is whether "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. On prejudice, the question is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

have been different." *Id.* at 694. Minnifield must satisfy *both* elements of *Strickland* to be entitled to habeas relief. *Id.* at 687.

Judicial review of trial counsel's performance "must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. On federal habeas review, this inquiry is doubly deferential: not only must the Court presume that "the challenged action might be considered sound trial strategy," *id.* (cleaned up), but under AEDPA, 28 U.S.C. § 2254(d)(1), this Court must also defer to the state court's application of *Strickland* unless it is objectively unreasonable, *see Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

In his habeas petition, Minnifield argues that Grinbarg failed to adequately investigate and interview alibi witnesses. Habeas Pet. at 32–41. He argues that Grinbarg's decision not to pursue the alibi witnesses is not entitled to a presumption of reasonable trial strategy because Grinbarg did not adequately investigate the option and "if counsel never learned what the witnesses would have said, he could not possibly have made a reasonable professional judgment." *Id.* at 32 (quoting *Blackmon v. Williams*, 823 F.3d 1088, 1104 (7th Cir. 2016)) (cleaned up). According to Minnifield, the record proves that Grinbarg was indeed told about the alibi because Grinbarg knew that Minnifield was at a party the night of the shooting. *Id.* at 34. Though Grinbarg did acknowledge that he never asked Minnifield for any names of potential alibi witnesses, he also testified that Minnifield never provided him with alibi-witness

15

names like Minnifield asserts. *Minnifield*, 2021 WL 1885980, at *4. The Illinois Appellate Court affirmed on the performance element of the two-step inquiry, and so it did not consider the merits of the prejudice element. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim … to address both components of the inquiry if the defendant makes an insufficient showing on one.").

Based on the record evidence, and the postconviction court's credibility findings, the Illinois Appellate Court reasonably concluded that Grinbarg's trial performance did not fall below an objective standard of reasonableness as required by *Strickland*. In its analysis of the performance element, the state appellate court held that Grinbarg "cannot be ineffective for failing to call" witnesses that he was not told about. *Minnifield,* 2021 WL 1885980, at *9. In support of its decision, the appeals court deferred to the postconviction court's finding that Grinbarg was more credible, because that court had the benefit of observing the witnesses firsthand. *Id.* at *8; *see also United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002) (acknowledging the deference given to a judge's credibility determination where the judge had the opportunity to observe firsthand the verbal and nonverbal behaviors of the witnesses). The appellate court also explained that Minnifield's witnesses testified inconsistently about who—if anyone—provided Grinbarg the witnesses' phone numbers, as well as about how Owens (Minnifield's mother) learned of Johnson, and whether Brock ever did actually call Grinbarg. *Minnifield*, 2021 WL 1885980, at *8. The appeals court also noted that Owens's and Michelle's testimonies differed from their affidavits when

16

it came to which witness names they claimed to have learned of and passed along to Grinbarg. *Id.*; *see also* R. 19-8, Postconviction Pet.'s Exh. D. at C 180 (Owens); R. 19-8, Postconviction Pet.'s Exh. C. at C 179 (Michelle). The appellate court thus explained that it was "[f]aced with competing accounts," and deferred to the postconviction court's credibility determination because it had "no basis to disturb" its finding. *Minnifield*, 2021 WL 1885980, at *8. The Illinois Appellate Court reasoned that if Grinbarg's testimony was true—as found by the postconviction court—then he did not know of the witnesses and cannot be faulted for not calling them. *Id.* at *9. And the police report, which Grinbarg acknowledged he "would have seen," did not specifically say that Minnifield was at a party *during* the shooting—only that Minnifield was at a party before his arrest. *Id.* So the appeals court concluded that "[e]ven if the police report … suggested a potential alibi defense, Grinbarg's chosen strategy—to rely on reasonable doubt—did not render his performance deficient." *Id.*

On those facts, and based on that analysis, the Illinois Appellate Court's decision did not contradict binding Supreme Court case law. The Supreme Court has held that "the proper standard for attorney performance is that of reasonably effective assistance." *Strickland*, 466 U.S. at 687. A petitioner claiming ineffective assistance of counsel must show that his attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed" by the Constitution. *Id.* "Effective representation of a criminal defendant requires pretrial preparation and investigation." *United States v. Weaver*, 882 F.2d 1128, 1138 (7th Cir. 1989). But a counsel's choice

17

regarding whether to investigate potential defense is reviewed with a "heavy measure of deference" to their judgment. *Strickland,* 466 U.S. at 691.

On federal habeas review, the question is whether the Illinois Appellate Court's affirmance of the postconviction court's credibility determination was objectively unreasonable. The answer is no: the appellate court reasonably deferred to the postconviction court—which heard live testimony from the witnesses—for its factual determinations, and its determination was reasonably supported by the record before it. The appellate court's majority opinion applied a deferential standard of review to the postconviction court's credibility finding, but then the appellate court went a step further in explaining the areas of inconsistency across Minnifield's witnesses. *See Minnifield*, 2021 WL 1885980, at *8. In addition to those inconsistencies, there was a substantial piece of circumstantial evidence—specifically, that Owens asked Grinbarg to handle the direct appeal after the guilty verdicts—which further discredits Owens's specific testimony that Minnifield complained to her about Grinbarg's handling of his case. *See id.* at *5. Given this, it was not unreasonable for the Illinois Appellate Court to affirm the lower court's finding that Minnifield's witnesses were not credible.

On top of this, Grinbarg's trial strategy aside from the alibi witness issue was reasonable—which also buttresses his credibility in the postconviction testimony context. Grinbarg went to trial with a plan of attacking the credibility of the State's key witnesses by emphasizing Straight's incentive—as a cooperator with the prosecution—to throw Minnifield under the bus, and also highlighting the weaknesses in

18

Cook-Mims's identification. *Minnifield*, 2021 WL 1885980, at *9. He sought to explain the physical evidence against Minnifield by convincing the jury that the gunshot residue was transferred to his client's hands while in the car. *Id.* So the appellate court's observation that Grinbarg had "subjected the case to meaningful adversarial testing," *id.*, was supported by the record and strengthens the basis for its credibility determination.

Minnifield, citing the appellate court's dissenting opinion, argues that the evidence proves that Grinbarg was on notice of Minnifield's potential alibi defense based on the police report. Habeas Pet. at 39–41. In support of this, Minnifield quotes the dissent, which stated that "Grinbarg's testimony at the hearing was little more than an absence of recollection, unsupported by any circumstantial evidence and contrary to contemporaneous documentation." *Id.* at 40 (quoting *Minnifield*, 2021 WL 1885980, at *12). It is of course true that suspicion can arise from a witness's repeated invocation of a lack of memory on important factual points. Here, however, it is understandable why Grinbarg lacked specific memories on every conversation that he had with Minnifield—around six years had passed in between the trial and the postconviction hearing. Grinbarg also testified to having been a trial lawyer for over 30 years. R. 19-10, Postconviction Hearing Tr. at 17:9–22. He stated that, as a matter of general practice, he "obviously" would have gone over the police report with his client. *Minnifield*, 2021 WL 1885980, at *4. He further stated that he had indeed asked Minnifield about why he was in the blue Charger that night, and *Minnifield would*

19

*not tell him. Id.* These statements were not so barren of recollection or detail as to make the state court's crediting of his testimony unreasonable.

Minnifield alternatively argues that Grinbarg failed to discover the alibi through adequate client interview and investigation because he only ever spoke to him in the bullpen lock-up before court appearances in the presence of other defend-ants in other cases. Habeas Pet. at 37–38. He cites the American Bar Association's guidance on where to conduct client discussions: "[d]efense counsel should ensure that space is available and adequate for confidential client consultations." *Id.* at 37 (quoting CRIM. JUST. STANDARDS FOR DEF. FUNCTION 4-3.1(e) (A.B.A. 2017)). Not sur-prisingly, the Court agrees that defense lawyers should make efforts to facilitate pri-vacy for confidential attorney-client discussions. But, here, the fact that Grinbarg only spoke to Minnifield in the bullpen does not seem to have undermined Minni-field's ability to be truthful and honest with him. Even under Minnifield's version of the conversations, Minnifield testified that he *did* tell Grinbarg about the party on the night of the shooting and gave him names of witnesses. *Minnifield*, 2021 WL 1885980, at *7. As the State points out, the fact that Minnifield took issue with the setting of their meetings cannot mean a failure on Grinbarg's part to meaningfully interview Minnifield when Minnifield maintains that he did in fact tell his counsel the essential aspects of his alibi. R. 18, Resp. Br. at 31. And this Court must defer not only to the appellate court's credibility determination on Grinbarg's statement—that is, that the attorney did not know of the alibi witnesses—but also on his testimony that it was his regular practice to read through the police report and that he did go

over the report with Minnifield. *Minnifield*, 2021 WL 1885980, at *4. Yes, the Court agrees that it would likely fall below the *Strickland* standard for counsel not to inquire into an alibi if there is evidence (such as a police report) suggesting one, but Grinbarg testified that he did ask Minnifield how he ended up in the car and that Minnifield did not provide specifics. *Id.*

In sum, the Illinois Appellate Court's application of the *Strickland* performance element was not objectively unreasonable because it was based on a credibility determination by the postconviction court and was reasonably supported by the record. Because Minnifield falls short on the performance element, there is no need to consider the prejudice element.

### C. Evidentiary Hearing

Minnifield makes an alternative request for an evidentiary hearing to further develop the facts alleged in his petition. *See* Habeas Pet. at 43–44. The Supreme Court has held that in deciding the appropriateness of an evidentiary hearing, "a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). But given the narrow standard of review prescribed by AEDPA, "if the [state] record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*

Here, Minnifield relies on the facts as they were already developed during the post-conviction evidentiary hearing. *See generally* Habeas Pet. (arguing that the

21

factual record proves that Grinbarg was told about the alibi witnesses). As discussed already, the state court record does not present factual questions that require further fleshing out in another hearing at this federal-habeas stage. The appellate court reviewed the record from the postconviction court's live-witness hearing and directly referenced the key parts of the testimony that supported the credibility determination. And there is no reason to think that another hearing would enable Minnifield to prove the factual allegations in his petition and thus prove that he is entitled to habeas relief. *Schriro*, 550 U.S. at 474. As a result, it is not appropriate to grant Minnifield an evidentiary hearing.

### D. Certificate of Appealability

In order to appeal the denial of a habeas petition, a petitioner must first obtain a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A); *Jennings v. Stephens*, 574 U.S. 271, 275 (2015). A certificate may issue only when the applicant has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Jennings*, 574 U.S. at 282. The substantial showing "standard is met when reasonable jurists could debate whether ... the petition should have been resolved in a different manner." *Welch v. United States*, 578 U.S. 120, 127 (2016) (cleaned up). For the reasons discussed in this opinion, Minnifield has not made that showing. It is true that one panel member of the Illinois Appellate Court dissented. But at this federal habeas stage, no reasonable jurists can debate the federal habeas petition's denial. This Court must defer, in effect, twice over: the postconviction court's reasonable live-witness credibility determination, and then the Illinois Appellate Court's reasonable

22

deference to that determination. With the credibility finding in place, the Illinois Appellate Court's rejection of the alibi-investigation claim cannot be deemed an unreasonable application of federal law. So no certificate of appealability shall issue from this Court.

## IV. Conclusion

For the reasons discussed above, Minnifield's habeas petition, R. 1, is denied. No certificate of appealability shall issue from this Court.

ENTERED:


    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 24, 2025